Jackie Lavaughn TOLAR and Ada Ruth Tolar, Appellants (Plaintiffs),

v.

AMAX COAL COMPANY, A DIVISION OF AMAX, INC., a New York corporation, Appellee (Defendant).

No. 92–282.

Supreme Court of Wyoming.

Nov. 1, 1993.

Ronald E. Triggs, Cheyenne, for appellants.

Marilyn S. Kite of Holland & Hart, Jackson, Marcelle Shoop (argued), of Holland & Hart, Cheyenne, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Jackie and Ada Tolar appeal from the district court's award of summary judgment in favor of Amax Coal Company, wherein the district court found that the cause of any damage to the Tolars' businesses was the result of a downturn in the Gillette economy and not the result of the escape of methane and hydrogen sulphide gases from a mine developed by Amax.

We reverse.

The Tolars state these issues:

1. Did the trial court err in determining as a matter of law that the appellants incurred no damages as a proximate cause of the appellee's negligence?

2. Did the trial court err in refusing to reverse its decision upon the appellants' motion for reconsideration?

3. Did the trial court err in granting summary judgment on the issue of punitive damages?

4. Are there genuine issues of material fact entitling the appellants to have all issues determined by a jury?

In turn, Amax offers this summary of the issues:

A. Did the district court properly grant summary judgment to Amax Coal Company where there was no dispute of fact that the Tolars suffered no compensable damages caused by the evacuation of Rawhide Subdivision, irrespective of how the gas seepage in Rawhide was caused?

B. Did the district court properly grant summary judgment to Amax Coal Com-

pany on the issue of punitive damages when plaintiffs suffered no compensable actual damages?

The Tolars opened a "Cent Saver" convenience store in Horizon, a subdivision located about seven miles north of Gillette and adjacent to Rawhide Village, on August 28, 1986. They contend that Amax's mining operations resulted in the release into the atmosphere of poisonous methane and hydrogen sulphide gases and that, on June 2, 1987, the Board of County Commissioners of Campbell County ordered the evacuation of Horizon and Rawhide Village because of the presence of those gases. The Tolars contend they were forced to evacuate their business and that the evacuation resulted in the complete destruction of that business, as well as consequential damages to other business enterprises they owned. The Tolars filed their complaint on December 8, 1989. The complaint presented four causes of action against Amax:

1. Amax's mining activities were inherently dangerous and created a public nuisance which proximately caused injury to the Tolars' business.

2. Amax's acts and omissions constituted a private nuisance which proximately caused injury to the Tolars.

3. Amax was negligent in its operation of the mine and that negligence was the proximate cause of the Tolars' injury.

4. Amax's actions were grossly negligent, caused injury to the Tolars and give rise to an award of punitive damages.

As the case progressed through the district court, the issue of whether the gas seepage actually occurred, or was the fault of Amax, was put to one side, and no evidence was heard concerning that matter. Rather, Amax filed a motion for summary judgment premised on the theory that, irrespective of the gas seepage, the Tolars' damages, if any, were the result of a general downturn in the Gillette area economy and the "Cent Saver" business would have failed whether or not there had been a gas seepage problem and subsequent evacuation.

The facts available to the district court were these: The Tolars moved to Gillette in 1982. They were in the business mainly of residential construction. They also operated a carpet business and an eave gutter installation business. They had no direct prior experience in the convenience store business. In August 1986, they opened a "Cent Saver" convenience store, almost entirely with borrowed money. They operated that store until late June of 1987; and, during that ten month period, the store was unprofitable. In early 1987, concern began to develop over the presence of methane and hydrogen sulphide gases in the Rawhide and Horizon Subdivisions. Those subdivisions were the primary market served by the convenience store. On June 2, 1987, the Board of County Commissioners of Campbell County ordered the evacuation of both the Rawhide Subdivision and the Horizon Subdivision, such evacuation to be accomplished not later than July 31, 1987. In response to that order, the Tolars closed the "Cent Saver" store on June 25, 1987. The evacuation order was rescinded on July 28, 1987. The Tolars did not reopen the store. The Tolars filed a chapter 11 bankruptcy in February 1988, at least in part because of the closure.

The Tolars' depositions reveal that they accomplished what they considered to be a careful market study before opening the store and believed that it would eventually be a profitable enterprise, although they did not expect it to be profitable during the first two years of operation. They also intended to expand the operation to include wine and beer sales, as well as a pizza parlor, in order to enhance the profitability of the store.

Expert witnesses were hired by both parties and, as might be expected, their views were quite divergent. Suffice it to say that the Tolars' expert opined that the store could have become a profitable venture, and the experts for Amax opined that the store was a foolish venture that was destined never to be profitable.

A significant factor in this case was the general downturn in the Gillette economy which began in the mid 1980's and persist-

ed until the time of the hearing on Amax's motions for summary judgment. One result of that economic downturn was a dramatic reduction in housing starts, and that was particularly true for the Rawhide and Horizon subdivisions where the Tolars had done much residential construction and where they intended to do more construction in the future.

■ We review a summary judgment in the same light as the district court, using the same materials and following the same standards. Summary judgment is proper only where there are no genuine issues of material fact and the prevailing party is entitled to judgment a matter of law. *Romero v. Hoppal*, 855 P.2d 366, 368 (Wyo.1993); *Eisenbarth v. Hartford Fire Ins. Co.*, 840 P.2d 945, 948 (Wyo.1992).

■ In the explanation of its decision to grant summary judgment for Amax, the district court viewed the testimony by and on behalf of the Tolars as "unsupported optimism" and "wishful thinking" and "[i]t appears to me quite clear that the convenience store would have failed irrespective of what happened with Amax." The district court based these conclusions on the general downturn in the Gillette economy.

Our discussion need only be brief. It is manifest from the evidence presented to the district court that, as a factual matter, the cause of the failure of the convenience store and the consequential economic problems experienced by the Tolars was hotly disputed. The Tolars claim the cause was the methane and hydrogen sulphide gas seepage, and Amax contends that it was the downturn in the Gillette economy. Very likely, the truth lies somewhere in between, but that is a question which must be resolved by a fact finder. As is evident from the testimony in this case thus far, there may be countless factors which enter into every business failure—lack of intelligent management or skilled technical direction, insufficient capitalization, basic infirmities in process or method, delays, miscalculations, inefficiency of personnel, an economic downturn, premature closure brought about by an external force, and so on. The very purpose of the jury system is to resolve such complex and multi-faceted problems. *See, e.g., Springfield v. State*, 860 P.2d 435, 443 (Wyo.1993) (*citing United States v. Jakobetz*, 955 F.2d 786, 796 (2nd Cir.1992)). Under these circumstances, we do not perceive the dual requirements of no genuine issue of material fact and that Amax is entitled to judgment as a matter of law. *See Jurkovich v. Estate of Tomlinson*, 843 P.2d 1166, 1173–74 (Wyo.1992). Thus, we are compelled to reverse.

The orders on summary judgment are reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.

TAYLOR, Justice, dissenting, with whom MACY, Chief Justice, joins.

In August of 1986, the economic climate in Gillette, Wyoming was in the doldrums. New home construction was at a near standstill. In July of 1988, the Department of Housing and Urban Development (HUD) auctioned 104 houses at an average price of $15,400.00. Construction of new housing in the Rawhide Village Subdivision, approximately seven miles north of Gillette, had ceased in 1982. In the Horizon Subdivision, also seven miles north of Gillette, only seven houses had been constructed by 1983; three had been sold and four had been foreclosed.

It was during this precarious time in 1986 that Jack and Ada Tolar (Tolars) embarked upon their ill-fated venture, the establishment of a "Cent Saver" store adjacent to the Rawhide Village and Horizon Subdivisions. The store, during its entire history of operation, did not realize a single profitable month. The Tolars reported taxable losses of more than $96,000.00 over the ten months the store was in operation.

In February of 1987, methane gas was discovered seeping out of the soil near the southern boundary of the Rawhide Village Subdivision. On June 2, 1987, the Board of County Commissioners of Campbell County, Wyoming ordered all residents of both the Rawhide Village and Horizon Subdivisions to evacuate by July 31, 1987. The

order to evacuate was rescinded on July 28, 1987; however, the Tolars had already closed the "Cent Saver" store on June 25, 1987.

The Tolars eventually dismantled and sold the "Cent Saver" store for $30,000.00. The Tolars applied $21,585 to the United States Small Business Administration (SBA) loan of 175,600.00, received a full release of liability and retained the lot on which the store was located.

Finally, the Tolars failed in all their business ventures: a construction business; a carpet business; a gutter business; a ranch purchased in September of 1986 with a loan of $350,000.00; and, of course, the "Cent Saver" debacle. The Tolars predictably filed for bankruptcy in February of 1988.

The Tolars assert that: *if* their creditors could have held off and they could have operated the store for a few years, it could have been profitable; *if* they could have obtained a liquor license, the store could have become profitable; *if* they could have built twenty-eight houses in the Horizon Subdivision, both the construction business and the store could have been profitable; and, *if* the gas leak had not resulted in an evacuation of the Rawhide Village and Horizon Subdivisions, the store could have been profitable. Amax Coal Company said it best in their appellate brief, " 'if wishes and buts, were candy and nuts, we'd all have a Merry Christmas!' " Now, perhaps, the net profit that has so long escaped the Tolars in business will be available to them from the courtroom at the expense of Amax Coal Company.

I would hold, as a matter of law, that the Tolars' claims must fail for two reasons. First, the Tolars have not shown that Amax Coal Company had a duty to prevent naturally occurring methane gas from seeping to the surface. The majority admits no evidence was heard on this element of the causes of action. Second, summary judgment in favor of Amax Coal Company was appropriate because the Tolars have not established that Amax Coal Company's operations were the proximate cause of the injuries their businesses sustained. *Century Ready–Mix Co. v. Campbell County School Dist.*, 816 P.2d 795, 802 (Wyo.1991). The Tolars' store did close during the period when an evacuation order had been issued by the county. However, when that order was rescinded, the Tolars did not reopen their store. The economic reality is that the store closed because it was unprofitable and their other businesses failed for the same reason. "Negligence and proximate cause are never presumed from the happening of an accident, and mere conjecture cannot form the basis of liability." *DeWald v. State*, 719 P.2d 643, 652 (Wyo. 1986). Amax Coal Company should not be held to be an insurer of the economic success of the Tolars' enterprises.

Many of the factors cited by the majority are present here, lack of intelligent management, miscalculation, inefficiency, and economic downturn. However, I disagree that the closing was premature—it was inevitable. The district court correctly assessed that economic projections could not dispel economic reality. Sam Walton would have failed under these circumstances.

I respectfully dissent.